**TATTERED COVER, INC., d/b/a the Tattered Cover Bookstore, Plaintiff–Appellant,**

v.

**The CITY OF THORNTON; and Thornton Police Officer Randy Goin, in his official capacity, Defendants–Appellees.**

**No. 01SA205.**

Supreme Court of Colorado, En Banc.

April 8, 2002.

As Modified on Denial of Rehearing April 29, 2002. *

* Justice COATS does not participate.

Recht & Kornfeld, P.C., Daniel N. Recht, Richard K. Kornfeld, Denver, Colorado, Attorneys for Plaintiff-Appellant.

Nathan, Bremer, Dumm & Myers, P.C., J. Andrew Nathan, Paige K. Hogan, Allyson C. Hodges, Denver, Colorado, Attorneys for Defendants–Appellees.

Faegre and Benson, LLP, Thomas B. Kelley, Steven D. Zansberg, Denver, Colorado, Attorneys for Amici Curiae American Booksellers Foundation for Free Expression, Mountain and Plains Booksellers Association, American Library Association, Freedom to Read Foundation, The Association of American Publishers, The International Periodical Distributors Association, The Periodical and Book Association of America, Inc., The Publishers Marketing Association, Pen American Center, American Society of Journalists and Authors, Colorado Freedom of Information Council, Thomas Jefferson Center for Freedom of Expression, National Coalition Against Censorship, and Feminists for Free Expression.

Holland & Hart LLP, A. Bruce Jones, Susannah W. Pollvogt, Nicholas M. Billings, ACLU Foundation of Colorado, Mark Silverstein, Denver, Colorado, Attorneys for Amicus Curiae American Civil Liberties Union of Colorado.

Justice BENDER delivered the Opinion of the Court.

## I. INTRODUCTION

With this case, we recognize that both the First Amendment to the United States Constitution and Article II, Section 10 of the Colorado Constitution protect an individual's fundamental right to purchase books anonymously, free from governmental interference. Law enforcement officials implicate this right when they seek judicial approval of a search warrant authorizing seizure of customer purchase records from an innocent, third-party bookseller. This case requires us to decide what test should be applied to balance the constitutional rights of individuals and bookstores against the duty of law enforcement officials to investigate crime.

We hold that the Colorado Constitution requires that the innocent bookseller be afforded an opportunity for an adversarial hearing prior to execution of a search warrant seeking customer purchase records. At that hearing, the court must apply a balancing test to determine whether the law enforcement need for the search warrant outweighs the harm to constitutional interests caused by its execution. In order for law enforcement officials to prevail, they must demonstrate a compelling governmental need for the specific customer purchase records that they seek. When conducting the balancing test, the court may consider whether there are reasonable alternative methods of meeting the government's asserted need, whether the search warrant is unduly broad, and whether law enforcement officials seek the purchase records for reasons related to the content of the books bought by any particular customer.

Applying this balancing test, we hold that the search warrant in this case is not enforceable and should not have issued. The plaintiff, Tattered Cover, Inc., is an independent bookstore. The defendants are the City of Thornton and one of the city's police officers ("the City").

The City argues that the information sought is necessary: (1) to prove that the operator of an illicit drug lab acted with the level of intent necessary to secure a conviction under state statute; (2) to prove the identity of the perpetrator; and (3) to "connect" a suspect to the lab. We consider the City's arguments within the factual context of this case. The City currently has signifi-

cant evidence as to who committed the crime, as well as reasonable additional means, other than serving the Tattered Cover with a search warrant, of discovering additional proof as to the identity of the perpetrator. The execution of the City's search warrant could substantially chill the exercise of fundamental state constitutional rights, primarily because at least one of the reasons why the City seeks the suspect's customer purchase record is related to the contents of the books that he may have purchased.

Thus, we conclude that the City has failed to demonstrate that its need for the Tattered Cover's customer purchase record is sufficiently compelling to outweigh the harm that would be caused to constitutional interests if the search warrant were executed. Therefore, we reverse the decision of the trial court.

## II. FACTS AND PROCEEDINGS BELOW

The following facts, most of which are undisputed, are gleaned from the record of the hearing below. As part of an ongoing drug investigation, the North Metro Task Force and an agent of the federal Drug Enforcement Administration ("DEA"), Diversion Investigator Timothy McFarland ("DI McFarland"), were cooperatively monitoring a trailer home in unincorporated Adams County in March of 2000. These law enforcement officials suspected that a methamphetamine lab was being operated out of the trailer. Officer Randy Goin was the lead investigator on the case.

The police believed that Suspects A, B, C, and D probably lived in the trailer.[1] Suspects A and C (both males) were registered with the trailer park's management as residents. The officers guessed, based on their surveillance, that Suspect A and Suspect B

were involved in an intimate relationship. Suspect D received mail at the trailer home.

On March 13, 2000, DI McFarland searched through some garbage from the trailer home. In doing so, he found evidence of drug operations. Additionally, he discovered a mailing envelope from the Tattered Cover addressed to Suspect A.[2] The label on the mailer listed the invoice number, order number, and customer phone number corresponding to whatever books had been shipped in the envelope. There was no clue, however, as to the titles of the particular books that the mailer had contained.

The following day, based upon a variety of evidence discovered during the course of the investigation, Officer Goin obtained a search warrant for the trailer home. With the assistance of the Adams County SWAT team, Officer Goin and DI McFarland executed this search warrant.

In the trailer's master bedroom, the police found a methamphetamine laboratory and a small quantity of the manufactured drug. Because of the location of the lab, the question of which suspect or suspects resided in the master bedroom became the focus of the police's investigation.

The officers believed that Suspects A and B occupied the master bedroom, but were unable to make a conclusive determination on this question. Relevant to this issue, the police noted the presence, in the master bedroom, of male and female clothes; Suspect A's personal address book; other papers bearing the names of Suspects A, B, and C; mail and bills belonging to various additional people; some firearms; printed instructions on how to manufacture a firearm silencer; and two books.[3]

The only objects from the room that were processed for fingerprints were the glassware from the methamphetamine lab, the

---

1. At the City's request, the specific names of the individuals involved in the underlying drug case are not part of the record. Therefore, we will refer to the individuals using the same letters that were used in the proceedings below. However, we note that Suspects A, B, C, and D are all real people whose identities are known to the police.

2. Most likely because the suspects' names were redacted from all materials submitted to it, the trial court found that the mailer was sent to the trailer's address "but not to a named individual." Both parties agree that this is incorrect and that the mailer was addressed to Suspect A.

3. There may have been more than two books in the bedroom. Officer Goin did not recall. Only two books were seized.

firearms, and the two books. The record made at the time of the hearing, nine months after the search was executed, does not reflect whether the police ever attempted to match the fingerprints found on the glassware or the firearms to any of the suspects. No usable prints were recovered from the two books.

When the police executed the search warrant, they found two people in the trailer home. Neither of these two people, referred to here as Person E (a male) and Person F (a female), resided in the home, though Person E had keys to a shed on the property. The parties debate the extent to which the police questioned Persons E and F. Person E, a transient, indicated that he did not know anything about the lab and that he just left some property at the trailer.[4] Person F said that she had just stopped by to see her boyfriend and could not provide any information. The police apparently did not specifically ask either Person E or Person F who resided in the master bedroom of the trailer.

After the search, Officer Goin believed that he had probable cause to arrest Suspect A. However, he wanted to accumulate more evidence of Suspect A's guilt before making the arrest.

The two books seized from the master bedroom were entitled *Advanced Techniques of Clandestine Psychedelic and Amphetamine Manufacture*, by Uncle Fester, and *The Construction and Operation of Clandestine Drug Laboratories*, by Jack B. Nimble. Officer Goin noticed that the books appeared to be new.[5] DI McFarland thought that there might be a connection between the Tattered Cover mailer found in the trash and these two new books. Officer Goin then noticed that the new books appeared to fit the dimensions of the mailer.

Officer Goin searched the Tattered Cover's webpage and discovered that it offered both books for sale. He and DI McFarland then served the Tattered Cover with a DEA administrative subpoena. This subpoena demanded the title of the books corresponding to the order and invoice numbers of the mailer, as well as information about all other book orders ever placed by Suspect A.[6] Using such a subpoena was ordinarily a successful technique for DEA officers, though such a subpoena lacks any legal force or effect.

Joyce Meskis, the owner of the Tattered Cover, instructed her attorney to tell the police that the bookstore would not comply with the subpoena, based on its concerns for its customers' privacy and First Amendment rights.

Instead of attempting to obtain an enforceable subpoena, Officer Goin approached prosecutors from the Adams County District Attorney's office to get a search warrant for the Tattered Cover. Several prosecutors at the Adams County DA's office refused to sign off on the warrant, voicing concerns about its scope and subject matter. Finally, a chief deputy at the Adams County DA's office told Officer Goin that he would contact the Tattered Cover's attorney and that, while he made attempts to negotiate for the Tattered Cover's voluntary release of the information, Officer Goin should interview the suspects in order to see if they could provide any information.

Without informing the Adams County DA's office, Officer Goin sought approval for his search warrant from the Denver DA's office. As approved by a Denver DA, the warrant authorized a search of the Tattered Cover for information related to the transaction in question, and for records of any other transaction involving Suspect A during the

---

4. Person E was subsequently arrested on unrelated firearms charges. He then invoked his right to remain silent.

5. One of the books was wrapped. Additionally, subsequent analysis by police experts revealed that the two books had never been read, though the covers had been handled.

6. Specifically, the subpoena stated:
Pursuant to an official criminal investigation being conducted by the Drug Enforcement Ad-

ministration of a suspected felony, it is requested that your company furnish the title and nature of any and all books and any other information available on the following order: Invoice # [redacted] Ord 87363 C# [redacted]. This order was shipped to: [Suspect A]. It is further requested that your company provide information regarding any other orders placed by this customer.

thirty-day period before the police searched the trailer.[7] A Denver county court judge then approved the warrant.

On April 5, 2000, Officer Goin, along with five other police officers, attempted to execute the search warrant on the Tattered Cover. Meskis immediately contacted the bookstore's attorney, who in turn contacted the Denver DA's office. A Denver DA persuaded the police officers not to execute the warrant until the Tattered Cover could litigate its validity.

The Tattered Cover brought suit, seeking to restrain the Thornton Police and Officer Goin from executing the search warrant. The trial court held a hearing on the question of the search warrant's validity.

At that hearing, the Tattered Cover presented unrefuted testimony that the execution of the search warrant in this case would have a substantial chilling effect on the willingness of its customers to purchase controversial books. Meskis stated that she had received an "enormous amount of feedback" from customers about this case, including over one hundred letters from customers in support of the Tattered Cover's position. Many customers told Meskis that they shopped at the Tattered Cover because of the Tattered Cover's policy of not disclosing customer book purchase records. Meskis further testified that if book purchase records were made available to investigative authorities, customers would not feel at ease perusing, buying, or reading a wide variety of books. Meskis pointed out that "people who read books are very concerned about First Amendment issues, and their privacy as it relates to First Amendment issues. This is not an uninformed society, they care."

There was also other testimony at the hearing about the warrant's likely effect. An official from the American Library Association testified about the chilling effect that results from disclosure of library circulation records. A bookstore owner from the State of Washington also testified about the concerns expressed by his customers about their privacy rights while a case analogous to this one, *In re Grand Jury Subpoena to Kramerbooks & Afterwords Inc.*, 26 Med. L. Rptr. 1599 (D.D.C.1998), discussed in detail below, was pending.

The trial court granted a restraining order with respect to the request for Suspect A's thirty-day purchasing history, but allowed the police to discover the information related to the mailing envelope found in the suspects' trash. This order was stayed, pending appeal.

In reaching its decision, the trial court announced a four-part test intended to balance the rights and interests of the Thornton Police Department, on the one hand, and the Tattered Cover and its customers, on the other. Specifically, the trial court considered: (1) whether there was a legitimate and significant government interest in acquiring the information; (2) whether there was a strong nexus between the matter being investigated and the material being sought; (3) whether the information was available from another source; and (4) whether the intrusion was limited in scope so as to prevent exposure of other constitutionally protected matters.

The plaintiff sought review of the trial court's decision, arguing that it should not be required to disclose any information regarding customer purchase records.[8] The defendants have accepted the trial court's judgement that the portion of the search warrant that contained the general demand for all of Suspect A's purchasing records during the

---

7. Specifically, the warrant authorized a search for:

Order, purchase and shipping records in the possession of the Tattered Cover Bookstore pertaining to a customer known as [Suspect A] who lists a current address as 5400 North Sheridan Blvd., #205, Arvada, Colorado, 80002, specifically "Inv: 793795, Ord: 87363 C# 666278" or any other transactions conducted by [Suspect A] between February 13, 2000 and March 14, 2000.

8. The Tattered Cover has never revealed what books were sent to Suspect A. Further, the Tattered Cover does not confess that the information sought from them is inculpatory to Suspect A. It argues that, irrespective of whether the information is inculpatory or exculpatory, customers have a First Amendment right to privacy in their book purchase records.

thirty-day period prior to the search is unenforceable, and do not seek review of that issue.

We accepted jurisdiction over this case pursuant to section 13–4–110(1)(a), 5 C.R.S. (2001). We reverse the trial court's order with respect to the police request for information related to the books mailed in the envelope found in the suspects' garbage.

## III. ANALYSIS

■ The Tattered Cover asserts its own constitutional rights, as well as the rights of the book-buying public, through this lawsuit.[9] Hence, we must consider not only the effect that our decision has on the expressive rights of the actual party to this case, the Tattered Cover, but to members of the general public as well. *Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir.1972) ("The First Amendment interests in this case are not confined to the personal rights of Bursey and Presley. Although their rights do not rest lightly in the balance, far weightier than they are the public interests in First Amendment freedoms that stand or fall with the rights that these witnesses advance for themselves.").

We begin our analysis by delineating the right implicated by the City's actions in this case. Specifically, we explain how the First Amendment and Article II, Section 10 of the Colorado Constitution safeguard the right of the public to buy and read books anonymously, free from governmental intrusion. After recognizing this fundamental constitutional right, we consider and resolve the tension between it and the needs of law enforcement officials who investigate crime. Next, we address a troubling procedural issue: the need for a pre-seizure adversarial hearing when law enforcement officials seek to use a search warrant to obtain customer book purchase records from an innocent, third-party bookstore. Finally, we apply the test that we adopt.

### A. The Right to Purchase and Read Books Without Fear of Government Disclosure or Reprisal

■ The First Amendment to the United States Constitution protects more than simply the right to speak freely.[10] It is well established that it safeguards a wide spectrum of activities, including the right to distribute and sell expressive materials, the right to associate with others, and, most importantly to this case, the right to receive information and ideas.[11] These various rights, though not explicitly articulated in either the Federal or Colorado Constitution, are necessary to the successful and uninhibited exercise of the specifically enumerated right to "freedom of speech." [12]

9. Though neither party contests this issue, we note that booksellers have standing to assert the constitutional speech rights of book-buyers. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).

10. The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. It is binding upon the states through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 664, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

11. *See, e.g., Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."); *Griswold v. Connecticut*, 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read ... and freedom of inquiry...."); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64–65 n. 6, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) ("The constitutional guaran-

tee of freedom of the press embraces the circulation of books as well as their publication."); *Smith v. California*, 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (stating that "the free publication and dissemination of books and other forms of the printed word furnish very familiar applications" of the First Amendment); *Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) ("The right of freedom of speech and press has broad scope.... This freedom embraces the right to distribute literature ... and necessarily protects the right to receive it."); *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938) (circulation of expressive material is constitutionally protected).

12. *See, e.g., Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (stating that the right to receive information is "an inherent corollary of the rights of free speech and press" both because "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them" and because the right is "a necessary predicate to the recipient's meaningful

Without the right to receive information and ideas, the protection of speech under the United States and Colorado Constitutions would be meaningless. It makes no difference that one can voice whatever view one wishes to express if others are not free to listen to these thoughts. The converse also holds true. Everyone must be permitted to discover and consider the full range of expression and ideas available in our "marketplace of ideas."[13] As Justice Brandeis so eloquently stated, "[Our founders] believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth." *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).[14]

The Supreme Court has recently reiterated the crucial role that the free exchange of ideas plays in our society, stating, "The citizen is entitled to seek out or reject certain ideas or influences without Government in-

terference or control." *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 817, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

■ Bookstores are places where a citizen can explore ideas, receive information, and discover myriad perspectives on every topic imaginable. When a person buys a book at a bookstore, he engages in activity protected by the First Amendment because he is exercising his right to read and receive ideas and information. Any governmental action that interferes with the willingness of customers to purchase books, or booksellers to sell books, thus implicates First Amendment concerns.[15]

Anonymity is often essential to the successful and uninhibited exercise of First Amendment rights, precisely because of the chilling effects that can result from disclosure of identity. The Supreme Court has recognized this principle numerous times in various contexts.[16] For instance, in *McIn-*

---

exercise of his own rights of speech, press, and political freedom") (emphasis removed); *Griswold,* 381 U.S. at 482–83, 85 S.Ct. 1678 ("Without those peripheral rights, the specific rights would be less secure.").

**13.** *See, e.g., Stanley,* 394 U.S. at 565, 89 S.Ct. 1243 ("[The petitioner] is asserting the right to be free from state inquiry into the contents of his library.... If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch."); *Lamont v. Postmaster Gen.,* 381 U.S. 301, 308, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.").

**14.** The full passage states:

Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the

greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by the law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

*Whitney,* 274 U.S. at 375–76, 47 S.Ct. 641 (Brandeis, J., concurring) (footnotes omitted).

**15.** *See, e.g., Roaden v. Kentucky,* 413 U.S. 496, 504, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973) (stating that a bookstore is "presumptively under the protection of the First Amendment"); *Smith,* 361 U.S. at 150, 80 S.Ct. 215 ("Certainly a retail bookseller plays a most significant role in the process of the distribution of books.").

**16.** *See, e.g., Talley v. California,* 362 U.S. 60, 64–65, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (invalidating a law that prohibited the distribution of

*tyre v. Ohio Elections Commission,* the Court stated, "Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (citation omitted). In another case, *Lamont v. Postmaster General,* 381 U.S. 301, 307, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), the Court struck down a federal statute that required citizens who wished to receive "communist political propaganda" to affirmatively so notify the post office. The Court's holding rested on concerns that First Amendment speech rights would be chilled if people were required to reveal their identities before being able to receive these expressive materials. *Id.*

■ The need to protect anonymity in the context of the First Amendment has particular applicability to book-buying activity. As was explained in *United States v. Rumely,* governmental inquiry and intrusion into the reading choices of bookstore customers will almost certainly chill their constitutionally protected rights:

> Once the government can demand of a publisher the names of the purchasers of his publications, the free press as we know it disappears. Then the spectre of a government agent will look over the shoulder of everyone who reads.... Fear of criticism goes with every person into the bookstall. The subtle, imponderable pressures of the orthodox lay hold. Some will fear to read what is unpopular, what the powers–that–be dislike.... [F]ear will take the place of freedom in the libraries, book stores, and homes of the land. Through the harassment of hearings, investigations,

reports, and subpoenas government will hold a club over speech and over the press. 345 U.S. 41, 57–58, 73 S.Ct. 543, 97 L.Ed. 770 (1953) (Douglas, J., concurring). The right to engage in expressive activities anonymously, without government intrusion or observation, is critical to the protection of the First Amendment rights of book buyers and sellers, precisely because of the chilling effects of such disclosures. Search warrants directed to bookstores, demanding information about the reading history of customers, intrude upon the First Amendment rights of customers and bookstores because compelled disclosure of book-buying records threatens to destroy the anonymity upon which many customers depend.

■ In sum, the First Amendment embraces the individual's right to purchase and read whatever books she wishes to, without fear that the government will take steps to discover which books she buys, reads, or intends to read. A governmental search warrant directed to a bookstore that authorizes seizure of records that reflect a customer's purchases necessarily intrudes into areas protected by this right.[17]

### B. Article 2, Section 10 of the Colorado Constitution

Like the Federal Constitution, our Colorado Constitution protects speech rights. Specifically, Article II, Section 10, entitled "Freedom of speech and press," provides that:

> No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty....

The United States Supreme Court has repeatedly acknowledged that its interpretation of the Federal Constitution defines the mini-

---

handbills that did not include the names and addresses of those who prepared, distributed, or sponsored it); *Bates v. City of Little Rock,* 361 U.S. 516, 527, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960) (reversing conviction based on violation of an ordinance requiring organizations to disclose their membership lists); *Bursey,* 466 F.2d at 1085 ("Protection of the anonymity of publishers, printers, and distributors of newspapers and pamphlets is an integral part of press freedom.").

17. We note that not all of a bookseller's records are protected by the First Amendment. Certainly, bills and other bookstore records that do not list the titles of books purchased by customers are protected by neither the First Amendment nor Article II, Section 10. We consider and address here only those bookstore records that implicate fundamental expressive concerns because they list the reading choices made by bookstore customers.

mum level of protections that must be afforded, through the Fourteenth Amendment, by the states. *See, e.g., PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). However, the Supreme Court has also recognized that a state may, if it so chooses, afford its residents a greater level of protection under its state constitution than that bestowed by the Federal Constitution. *Id.*

With respect to expressive freedoms, this court has recognized that the Colorado Constitution provides broader free speech protections than the Federal Constitution.[18] In *Bock v. Westminster Mall Co.,* 819 P.2d 55 (Colo.1991), we detailed the source of this increased protection. We relied on the differences between the language of the First Amendment to the United States Constitution and the language of the Colorado Constitution.[19] *Id.* at 58. In addition, we recognized our state's extensive history of affording broader protection under the Colorado Constitution for expressive rights. *Id.* at 59.

 As discussed in section IIIA above, the First Amendment protects one's right to receive and distribute information and ideas and to purchase reading materials anonymously, without governmental interference. This right also receives protection under our Colorado Constitution. Indeed, because our state constitution provides more expansive protection of speech rights than provided by the First Amendment, it follows that the right to purchase books anonymously is afforded even greater respect under our Colorado Constitution than under the United States Constitution.

## C. The Intersection Between the Constitutional Right to Purchase Books Anonymously and Search Warrants Aimed at Bookstores

Having defined the right at issue in this case, we next address the collision between the exercise of this right and the investigative efforts of law enforcement officials. We consider the legal test that applies to determine when law enforcement officials may use a search warrant to obtain customer book purchase records from an innocent, third-party bookstore, and the circumstances that trigger application of that test.

 Both the Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constitution guard against "unreasonable searches and seizures." U.S. Const. amend. IV; Colo. Const. art. II, § 7. Search warrants are the mechanism used to protect against unjustified police intrusions that would otherwise violate the dictates of the Fourth Amendment and Article II, Section 7. *See, e.g., Steagald v. United States,* 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). In order to obtain a search warrant, law enforcement officials must demonstrate, prior to any search, that probable cause exists to believe that the legitimate object of such a search is located in a specific place. *See, e.g., id.* The warrant itself must describe with particularity the place to be searched and the objects that may be seized. *See, e.g., Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). Such requirements safeguard citizens against "the wide-

**18.** *See, e.g., Lewis v. Colo. Rockies Baseball Club, Ltd.,* 941 P.2d 266, 271 (Colo.1997); *Denver Publ'g Co. v. City of Aurora,* 896 P.2d 306, 309 n. 4 (Colo.1995); *Bock v. Westminster Mall Co.,* 819 P.2d 55, 59 (Colo.1991); *People v. Ford,* 773 P.2d 1059, 1066 (Colo.1989); *Parrish v. Lamm,* 758 P.2d 1356, 1365 (Colo.1988); *People v. Seven Thirty–Five East Colfax, Inc.,* 697 P.2d 348, 356 (Colo.1985); *People v. Berger,* 185 Colo. 85, 89, 521 P.2d 1244, 1246 (1974); *In re Hearings Concerning Canon 35 of the Canons of Judicial Ethics,* 132 Colo. 591, 592, 296 P.2d 465, 466–67 (1956).

**19.** Specifically, the First Amendment to the United States Constitution uses a negative command to protect speech rights. U.S. Const. amend. I

("Congress shall make no law ... abridging the freedom of speech...."). In contrast, "the Colorado Constitution advances beyond the negative command of its first clause to make an affirmative declaration in the second clause." *Bock,* 819 P.2d at 58. This additional affirmative command supported our conclusion that the Colorado Constitution "enhances the already preferred position of speech under the First Amendment of the United States Constitution." *Id.; see also id.* at 59 ("[T]he second clause of Article II, Section 10 of our own constitution ... is an affirmative acknowledgement of the liberty of speech, and therefore of greater scope than that guaranteed by the First Amendment.").

ranging exploratory searches the Framers [of the Constitution] intended to prohibit." *Id.*

Conflicts between First Amendment and Fourth Amendment rights are inevitable when law enforcement officials attempt to use search warrants to obtain expressive materials. This is because a seizure of documents, books, or films is conceptually distinct from a seizure of objects such as guns or drugs. *See, e.g., A Quantity of Books v. Kansas,* 378 U.S. 205, 211–12, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964). The former category of objects implicates First Amendment expressive rights, while the latter category of objects does not. *Id.*

■■■ Outside the context of obscenity, few federal cases have discussed this collision between the Fourth Amendment and the First Amendment. However, the Supreme Court has made clear that, when expressive rights are implicated, a search warrant must comply with the particularity requirements of the Fourth Amendment with "scrupulous exactitude." *Zurcher v. Stanford Daily,* 436 U.S. 547, 564, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

In *Zurcher,* law enforcement officials served a search warrant on a student newspaper, seeking photographic evidence that would help them identify demonstrators who assaulted police officers assisting in the break-up of a demonstration. 436 U.S. at 551, 98 S.Ct. 1970. The newspaper challenged the warrant on the basis of the First and Fourth Amendments, arguing that the police should be required to use a subpoena duces tecum instead of a search warrant because of the important First Amendment interests at stake. *Id.* at 563, 98 S.Ct. 1970. The Supreme Court rejected this argument, implying that First Amendment concerns can never entirely preclude the execution of a search warrant that complies with the Fourth Amendment: "Properly administered, the preconditions for a warrant—probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness—should afford sufficient protection against the harms that are assertedly threatened by warrants

for searching newspaper offices." *Id.* at 565, 98 S.Ct. 1970.

The Supreme Court's pronouncements in *Zurcher* can be read to mean that, beyond the "scrupulous exactitude" requirement, the First Amendment places no special limitation on the ability of the government to seize expressive materials under the Fourth Amendment. We acknowledge that this is arguably the import of *Zurcher.* Thus, we ground the holding in this case in our Colorado Constitution.

The Fourth Amendment provides significant and important privacy protections to Americans. Nonetheless, there are occasionally situations where the Fourth Amendment simply does not go far enough. This case presents one such situation.

We are hesitant to hold that the only constraint limiting law enforcement officials' ability to obtain a search warrant that gives them access to a bookstore's customer purchase records, beyond the general Fourth Amendment requirements applicable to all warrants, is that the search warrant in question describe the expressive material to be seized with scrupulous exactitude. Under this approach, assuming that the probable cause standard was met and that the materials to be seized are very precisely described, expressive materials can *always* be seized, irrespective of the substantial chilling effects that might result. Thus, fundamental expressive rights could never preclude law enforcement officials from seizing particular expressive materials.

To take a simple example, one could imagine a situation where law enforcement officials might have probable cause to search a bookstore for all records relating to any purchases of the book *The Anarchist's Cookbook.* The requirement that the police describe the materials to be seized with "scrupulous exactitude" could be easily met in this situation by limiting seizure to those records involving sales of the specific book. We agree that, depending on the exact factual circumstances, such a seizure might be necessary and appropriate. However, the substantial chilling effects that could occur if this hypothetical search warrant were executed mean

that there might also be circumstances where the police should be entirely precluded from executing the warrant.

■ Thus, we find the protections afforded to fundamental expressive rights by federal law, under the above interpretation of *Zurcher*, to be inadequate. We turn to our Colorado Constitution, which we now hold requires a more substantial justification from the government than is required by the Fourth Amendment of the United States Constitution when law enforcement officials attempt to use a search warrant to obtain an innocent, third-party bookstore's customer purchase records.[20]

■ Our basic rationale for this holding is that, before law enforcement officials are permitted to take actions that are likely to chill people's willingness to read a full panoply of books and be exposed to diverse ideas, law enforcement officials must make a heightened showing of their need for the innocent bookstore's customer purchase records. We emphasize that a bookstore's customer purchase records are not absolutely protected from discovery and that this question must be decided on the particular facts of each case.

### 1. Development of a Balancing Test

■ We now turn to a discussion of the test that must be applied to determine the circumstances in which law enforcement officials will be permitted to use a search war-

rant to obtain a bookstore's customer purchase records.

The facts of this case are unusual. The parties have cited, and our independent research discloses, only one previous case where a court has considered the constitutionality of law enforcement attempts to gain access to the purchase records of a bookstore customer. Although that case, *In re Grand Jury Subpoena to Kramerbooks & Afterwords Inc.*, 26 Med. L. Rptr. 1599 (D.D.C. 1998) (hereinafter *Kramerbooks*), arose in the context of investigative subpoenas, not a search warrant, we find it to be instructive as to the test that should be applied in this case because it addresses and balances the same competing concerns presented here.[21]

*Kramerbooks* involved subpoenas issued by the Office of Independent Counsel to two bookstores. *Id.* at 1599. The subpoenas sought book purchase records related to a particular customer under investigation, Monica Lewinsky. *Id.* Similar to this case, the bookstores claimed that their revelation of book purchase records would have a chilling effect on the exercise of their customers' First Amendment rights. *Id.* at 1600.

The *Kramerbooks* court determined, as we do for search warrants, that the subpoenas directed to innocent bookstores implicate First Amendment concerns. *Id.* The court then briefly considered a Supreme Court case involving a grand jury subpoena and the First Amendment right to freedom of the press, *Branzburg v. Hayes.*[22] *Id.* at 1600–01.

---

**20.** We reiterate that our discussion is narrow. We consider only the constitutional protections afforded when law enforcement officials seek to use a search warrant to obtain customer purchase records from a bookstore. We do not consider the constitutional implications of any other type of government action that implicates expressive rights.

**21.** The defendants argue that *Kramerbooks* is distinguishable from this case because the subpoena used in *Kramerbooks* was used as part of a "fishing expedition"—i.e., as part of a government attempt to discover general incriminating evidence and not as part of a focused attempt to discover particular information. We note that the breadth of the subpoena is not relevant to the question of what test should be applied but, instead, is something a court should consider during application of the test we define. If a search warrant is overly broad, law enforcement

officials will be unable to show that they have a compelling interest in or need for the particular information that they seek.

**22.** In *Branzburg*, a plurality of the Court held that the First Amendment does not prevent a grand jury from requiring a reporter to disclose information received from confidential sources. 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). This was true despite the potential effects that such forced disclosure could have upon the willingness of secret informants to confide in reporters and, thus, the ultimate chilling effect its holding could have on freedom of the press. *Id.* at 693, 92 S.Ct. 2646.

Because it was clear to the *Branzburg* Court that the reporters' asserted testimonial privilege was outside the scope of the First Amendment, it was not necessary for the Court to specifically articulate the test that should be applied to deter-

Because *Branzburg* was not dispositive of the issues presented, the *Kramerbooks* court turned to federal circuit court cases involving collisions between governmental investigative efforts and the First Amendment. *Id.* at 1601.

The court imported the standard applied in those cases to the bookstore context. Thus, the court held that, in order to demonstrate the enforceability of the subpoena, the government must show: (1) a compelling interest in or need for the information sought; and (2) a sufficient connection between the information sought and the criminal investigation. *Id.* The court then ordered the special prosecutor to submit documents explaining how this test was satisfied for the OIC subpoenas at issue. *Id.*

The balancing test used by the *Kramerbooks* court is similar to that used by the numerous courts that have addressed situations where government action has implicated fundamental speech rights. Specifically, courts have recognized that a very high level of review, referred to as "strict scrutiny" or "exacting scrutiny" is to be undertaken when government action collides with First Amendment rights.[23] *See, e.g., Playboy Entm't Group,* 529 U.S. at 813, 120 S.Ct. 1878; *Buckley v. Valeo,* 424 U.S. 1, 64–65, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure."). This heightened standard is necessary because governmental action that burdens the exercise of First Amendment rights compromises the core principles of an open, democratic society.

 In order to withstand strict scrutiny, the government must have some "compelling" interest at stake. *See, e.g., Gibson v. Florida Legislative Investigation Comm.,*

372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). Anything less will not justify an abridgement of fundamental speech rights. *Beverly v. United States,* 468 F.2d 732, 748 (5th Cir.1972) ("It is simply a statement of long recognized horn-book principles of constitutional law to say that no government, either state or federal, may encroach upon First Amendment rights without the demonstration of a compelling interest.").

Courts have also required the government to demonstrate a substantial connection between the government's action and the interest the government seeks to further. *See, e.g., Buckley,* 424 U.S. at 64, 96 S.Ct. 612; *Gibson,* 372 U.S. at 546, 83 S.Ct. 889. While this prong of the test has been phrased differently by different courts, its import is the same in every case. *Id.* The government must not do anything that abridges fundamental rights unless the government's action bears the appropriate connection to its compelling government interest, and this connection must be both direct and significant.

Further, when government action implicates fundamental expressive rights, courts have imposed a few other requirements that must be met in order for the government action to withstand strict scrutiny. For instance, courts commonly require that government action be no broader than necessary to advance its compelling interest. *See, e.g., Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Bursey,* 466 F.2d at 1083 (stating that the government must show that "the incidental infringement upon First Amendment rights is no greater than is essential to vindicate its subordinating interests"). That is, government action must not chill the exercise of fundamental expressive rights any more than absolutely necessary to advance the government's interest. This requirement is frequently referred to as the

---

mine whether a grand jury's investigative efforts have violated the First Amendment. However, the Court did not foreclose lower courts from creating such a test and, relevantly, did not disapprove of the two-part test that had been used by the lower court in *Branzburg,* and was ultimately adopted by the *Kramerbooks* court. *Id.* at 700, 92 S.Ct. 2646.

**23.** A different standard is used when the government adopts content-neutral time, place, and manner restrictions on speech. *See, e.g., Hill v. Colorado,* 530 U.S. 703, 725–26, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). The cases involving that standard are not relevant here because we are not addressing a situation involving evenhanded regulation.

"least restrictive means" requirement. *See, e.g., Buckley,* 424 U.S. at 68, 96 S.Ct. 612.

The balancing test described above addresses the competing concerns implicated when governmental action directly or incidentally abridges constitutionally protected speech rights. It has been used in numerous factual and procedural contexts.[24] We modify the test only slightly to address the specific issues raised when law enforcement officials seek to seize an innocent, third-party bookstore's customer purchase records. We hold that law enforcement officials must demonstrate a sufficiently compelling need for the specific customer purchase record sought from the innocent, third-party bookstore.

When considering generally applicable laws and regulations that implicate fundamental speech rights, it is logical to separate out two distinct steps: first, to consider the government's justification for the law and, second, to determine whether the law serves that purpose. In the context of criminal investigations, the two prongs run together. This is so because the law enforcement officials' need to investigate crime will almost invariably be a compelling one. Thus, the court must engage in a more specific inquiry as to whether law enforcement officials have a compelling need *for the precise and specific information sought.* Yet this more particularized showing captures the nexus requirement, normally considered separately from the government's interest.

The second prong of the *Kramerbooks* test, that there be a "sufficient connection" between the criminal investigation and the information sought, is therefore duplicative of the first prong of the test because the government's need "for the information sought" cannot be compelling unless there exists a sufficient nexus between the investigation and the information sought.

Here, the trial court recognized that strict scrutiny was the appropriate standard in this case and then applied a balancing test that considered four factors: (1) the government's interest in acquiring the information[25]; (2) the nexus between the matter investigated and the material sought; (3) whether the information was available from another source; and (4) whether the intrusion was limited in scope so as to prevent exposure of other constitutionally protected materials.

While the test that we use does not specifically include either the third or fourth prongs of the trial court's test, we believe that these factors are implicit in the balancing test that we develop. The law enforcement officials'

**24.** This test has been applied by the United States Supreme Court in the context of a legislative investigative subpoena that implicated fundamental speech rights. *Gibson,* 372 U.S. at 546, 83 S.Ct. 889 ("[I]t is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest."). It has also been applied to grand jury subpoenas, OIC subpoenas, and administrative subpoenas that implicate fundamental expressive rights. *See, e.g., In re Grand Jury Subpoenas Duces Tecum,* 78 F.3d 1307, 1312 (8th Cir.1996); *Nat'l Commodity & Barter Ass'n v. United States,* 951 F.2d 1172, 1174 (10th Cir.1991); *United States v. Comley,* 890 F.2d 539, 544 (1st Cir. 1989); *In re Grand Jury Proceeding,* 842 F.2d 1229, 1233 (11th Cir.1988); *Brock v. Local 375, Plumbers Int'l Union,* 860 F.2d 346, 350 (9th Cir.1988); *In re Grand Jury Proceedings,* 776 F.2d 1099, 1102–03 (2d Cir.1985); *In re Grand Jury Subpoena to the First Nat'l Bank, Englewood, Colo.,* 701 F.2d 115, 117 (10th Cir.1983); *In re Grand Jury Subpoena for Appearance of Patrick Faltico,* 561 F.2d 109, 111 (8th Cir.1977); *Bursey,* 466 F.2d at 1083; *Kramerbooks,* 26 Med. L. Rptr. at 1601 (discussed above). *But see In re Grand Jury 87–3 Subpoena Duces Tecum,* 955 F.2d 229, 232 (4th Cir.1992) (concluding that the above balancing test does not apply because the Supreme Court declined to apply this test in both *Branzburg* and *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) ).

**25.** Though the trial court recognized that strict scrutiny should be applied to the search warrant in this case, it then described a lower standard of review in the first prong of its test. The trial court stated that law enforcement officials must demonstrate a "legitimate and significant" interest in the information sought. We do not agree with this conclusion. Courts have long recognized that "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest." *Buckley,* 424 U.S. at 64, 96 S.Ct. 612. Thus, we now clarify that law enforcement officials must demonstrate a compelling interest in or need for the information sought.

need for the information sought cannot be compelling if there are reasonable alternate ways of conducting an investigation other than by seizing a customer's book purchase record. Officials must exhaust these alternatives before resorting to techniques that implicate fundamental expressive rights of bookstores and their customers.

The fourth factor considered by the trial court, the breadth of the warrant, is also captured by the "compelling need for the information sought" test. When considering a search warrant, a court must separately consider each item that the law enforcement officials seek to obtain. For any particular expressive material sought, if the request is overly broad, then the law enforcement officials will not have a compelling need for that particular item.

 The ultimate question is whether the law enforcement need for the customer purchase record is sufficiently compelling to outweigh the harms caused by execution of the search warrant. We acknowledge that it is difficult to predict the extent of harm that would be caused by execution of any particular search warrant. However, we note that, in most situations, there is a lesser danger of harm to constitutionally protected interests when the customer purchase record is sought for reasons entirely unrelated to the contents of the materials purchased by the customer. The chilling effect that results from disclosure of customer purchase records occurs because of the general fear of the public that, if the government discovers which books it purchases and reads, negative consequences may follow. However, if the government seeks a purchase record to prove a fact unrelated to the content or ideas of the book, then the public's right to read and access these protected materials is chilled less than if the government seeks to discover the contents of the books a customer has purchased.

For example, if the police were to find a book about baseball with a Tattered Cover price sticker on it in the vicinity of an illegal drug lab, and they wished to find out who purchased the baseball book in order to place

that person at the scene of the crime, the harm to constitutional interests caused by forced disclosure of the Tattered Cover's book records might well be permissible under the balancing test we describe.[26] Similarly, if law enforcement officials seek to discover a book purchase record to disprove a suspect's alibi, on the theory that the bookstore record proves that the suspect was at the bookstore at a particular time, the contents of the books bought are not significantly at issue and the harm to the public caused by the seizure of the record is less than if the facts were otherwise.

To summarize, we hold that our state constitution requires that the government, when it seeks to use a search warrant to discover customer book purchase records from an innocent, third-party bookstore, must demonstrate that it has a compelling need for the information sought. In determining whether law enforcement officials have met this standard, the court may consider various factors including whether there are reasonable alternative means of satisfying the asserted need and whether the search warrant is overly broad. The court must then balance the law enforcement officials' need for the bookstore record against the harm caused to constitutional interests by execution of the search warrant. This harm likely will be minimal if the law enforcement officials' reasons for wanting the book purchase record are entirely unrelated to the contents of the books.

### 2. Procedural Issues

 Having defined and explained the two-part test applicable to this case, we turn to the procedural context in which this test ordinarily must be applied.

The procedural context of this particular case is unusual. The City sought and obtained a search warrant as part of an attempt to discover specific information ordinarily protected from involuntary disclosure to law enforcement officials by the First Amendment and Article II, Section 10. Then the City voluntarily agreed to delay execution of

---

**26.** The ultimate determination would rest on additional facts not provided in the example, such as whether the police had other ways of discovering the identity of the perpetrator and whether the search warrant was drafted narrowly.

the warrant until its validity could be litigated in the district court.

We are aware, however, that the City could have proceeded to conduct the search before giving a court the opportunity to consider the legality of the warrant in an adversarial setting. This is of grave concern since the chilling effect felt by the general public is caused by the very fact of governmental discovery of book-buying purchases. This chilling effect is unlikely to be offset by any procedural protections, such as the exclusionary rule, that might subsequently be afforded to Suspect A if the search is later deemed to be unconstitutional.

People in Colorado have a privacy interest in their book-purchase records and, therefore, we recognize that special procedural protections must be afforded to bookstores when law enforcement officials attempt, pursuant to Article II, Section 7, to use a search warrant to obtain these records. The protections afforded by the Colorado Constitution are of little value if the bookstore is not given an opportunity to challenge the law enforcement officials' action before the search warrant is executed. Without the opportunity to protect its rights and the rights of its customers, a bookstore, unrepresented at the typical ex parte search warrant proceeding, might receive short shrift in any constitutional analysis of law enforcement's right to obtain such a search warrant. This point is borne out by the facts of this case. The City's use of progressively narrower requests at each stage of its request for the information convinces us that a hearing is necessary to protect innocent, third-party booksellers and the book-buying public.

The original DEA subpoena was unlimited in its terms. It sought all of Suspect A's book-purchasing records from the Tattered Cover. Because of the concerns of the district attorney's office, the City's request was narrowed somewhat before the search warrant was approved by a county court judge. The search warrant sought information related to the one transaction for which the police had an invoice number as well as the thirty-day purchasing history of Suspect A.

After the adversarial hearing, the trial court held that the thirty-day purchasing history request was too broad and therefore unconstitutional. On appeal to us, the City abandons its request for Suspect A's thirty-day purchasing history information, thus implicitly conceding that it was never entitled to the information in the first place.

Further, the remaining information sought to be seized, related to the specific invoice, has been the subject of heated debate. Had it not been for the Tattered Cover's steadfast stance, the zealousness of the City would have led to the disclosure of information that we ultimately conclude is constitutionally protected. This chronology demonstrates the importance of providing the bookseller with an opportunity to contest the actions of law enforcement officials in an adversarial setting.

Also supporting the need for an adversary hearing is the fact that, whenever law enforcement officials rifle through a bookstore's file cabinets or computer records, the book-buying records of innocent customers will almost inevitably be exposed to governmental observation. The rights of these innocent customers, who may not want the government to know which books they read, must receive adequate protection.[27]

The central rationale for the ex parte warrant process does not apply when an innocent, third-party bookstore's book-buying records are seized. In the case of a typical warrant procedure, the magistrate must consider two competing factors: the interests of law enforcement and the privacy rights of the suspect. An ex parte procedure, and the invasive search and seizure that follows, is justified in such a case because of the exigencies of law enforcement and the practical reality that a suspect, if notified ahead of

---

27. We note that law enforcement officials could have used another, less invasive technique than a search warrant, had Suspect A been charged. The City concedes that it had probable cause to arrest and charge Suspect A without the contested Tattered Cover record. If it did so, then the prosecution could have attempted to obtain the book purchase record using a trial subpoena duces tecum under Colo.Crim. P. 17(c). Such a subpoena would have protected the rights of non-suspect Tattered Cover customers.

time, has a motive to destroy evidence or otherwise frustrate the search for particularly incriminating records. This justification lacks persuasive force when the subject of the search is an innocent, third-party bookseller.

Thus, we hold that an innocent, third-party bookstore must be afforded an opportunity for a hearing prior to the execution of any search warrant that seeks to obtain its customers' book-purchasing records. At the hearing, the court will apply the balancing test described above to determine whether law enforcement officials have a sufficiently compelling need for the book purchase record that outweighs the harms associated with enforcement of the search warrant.

## IV. Application

Having outlined the relevant constitutional principles, we now apply them to this case. We consider whether the City has demonstrated that it has a compelling need for the Tattered Cover's book purchase record that outweighs the chilling effect likely to result if the search warrant is executed.

Through its arguments to the trial court and us, as well as through the testimony of Officer Goin and DI McFarland, the City describes three reasons that it is important for it to know whether Suspect A purchased the two "how to" books found at the scene of the crime. First, the City states that this will help them to prove the mens rea of the crime, that Suspect A "intentionally or knowingly" operated the methamphetamine lab. Second, the City contends that proof that Suspect A purchased the "how to" books will help them to prove that Suspect A occupied the master bedroom, the place where the books and methamphetamine lab were found. Finally, the City asserts that the Tattered Cover invoice "connects" Suspect A to the crime. We consider each of the City's three justifications in turn, despite the fact that the boundaries between the justifications overlap in some ways.

■ With respect to the argument that evidence that Suspect A purchased the books will help prove that he knowingly or intentionally operated a methamphetamine lab, we note that the City's search of the bedroom revealed a fully operational and functional methamphetamine lab as well as a small quantity of the manufactured drug. The two "how to" books were found in the immediate vicinity of the lab. The physical presence of the lab itself, and of these books, goes a long way towards proving that the operator of the lab did not accidentally manufacture methamphetamines. These facts leave no doubt that the person or persons who operated this lab did so intentionally.

We must also consider the chilling effect that would be caused by execution of the search warrant. The Tattered Cover presented unrefuted testimony that the execution of the search warrant in this case would have a substantial chilling effect on the willingness of its customers to purchase controversial books. As discussed earlier, Joyce Meskis, the owner of the Tattered Cover, stated that she had received an "enormous amount of feedback" from customers about this case, including over one hundred letters from customers in support of the Tattered Cover's position. Many customers told Meskis that they shopped at the Tattered Cover because of the Tattered Cover's policy of not disclosing customer book purchase records. Meskis testified that if book purchase records were made available to investigative authorities, customers would not feel at ease perusing, buying, or reading a wide variety of books. Meskis pointed out that "people who read books are very concerned about First Amendment issues, and their privacy as it relates to First Amendment issues. This is not an uninformed society, they care."

Additionally, an official from the American Library Association testified about the chilling effect that results from disclosure of library circulation records and a bookstore owner from the State of Washington testified about the concerns expressed by his customers about their privacy rights while the *Kramerbooks* case was pending.

On balance, we conclude that the City's need for the invoice, in order to help them prove the statutorily required mens rea element, is not sufficiently compelling to outweigh the harm that would be caused by execution of the search warrant.

Thus, we turn to the City's second justification, that the invoice will help them to demonstrate that Suspect A occupied the master bedroom and, hence, must have operated the methamphetamine lab. In essence, the City wishes to use the purchasing record to place Suspect A at the scene of the crime.

As discussed above, it will be difficult for law enforcement officials to demonstrate that their need for a customer's book purchase record is sufficiently compelling to outweigh the harms caused by forced disclosure of the record if there are reasonable alternative means by which the officials can meet their asserted need. We emphasize that our inquiry is focused on the question of whether the City had reasonable alternative ways of discovering who operated the methamphetamine lab, not on the question of who bought the "how to" books.

One direct way to identify the operator of the lab is to analyze the fingerprints that Officer Goin found on the glassware from the lab to see if they match to Suspect A. However, the record made at the time of the hearing, nine months after the search of the trailer was executed, does not reflect that the City ever followed up on these fingerprints. Certainly that evidence would be more indicative of the identity of the operator of the drug lab than any connection that might be established by proof that Suspect A ordered books that were subsequently found in the room.

If the City needs evidence of who occupied the master bedroom, as indirect evidence of who must have operated the lab, the record reveals a number of alternative ways in which this information could have been ascertained. The master bedroom in the trailer, apart from the presence of the methamphetamine lab, appears to have been a typical bedroom containing clothes, furniture, papers, and other personal objects. Clothes and shoes could have been examined to see if the sizes matched Suspect A. Objects could have been fingerprinted.[28] The bed and flooring could have been examined for hair or other DNA samples. Beyond this physical evidence, there are numerous witnesses that

the City likely could have interviewed without compromising the integrity of their criminal investigation. The parties hotly contest whether it would have been appropriate for the government to interview Suspects A, B, C, or D. This is an issue that neither we nor the trial court is equipped to resolve. However, neighbors, trailer park managers, and other visitors to the trailer, including Persons E and F, may know or have known who occupied the master bedroom. The record does not indicate that these persons were interviewed to determine who lived in the master bedroom.

Finally, we note that the Tattered Cover customer purchase record does not contribute much to the City's attempt to show that Suspect A occupied the master bedroom. Objects belonging to several different people were found in the bedroom. Thus, assuming that the two "how to" books belonged to Suspect A, their presence in the bedroom does not necessarily mean that Suspect A occupied that room.

In arguing that it needs the Tattered Cover invoice to identify Suspect A as the occupant of the master bedroom, the City suggests that the Tattered Cover customer purchase record is not sought for a reason related to the content of the two "how to" books. As explained above, a non-content related purpose for seeking a customer book purchase record will ordinarily result in a lesser chilling effect than experienced when such a record is sought for a content-related purpose. However, the content-related uses of the book purchase record in this case are not easily separated from the non-content related uses. Thus, we reiterate our earlier conclusion that the enforcement of this search warrant is likely to result in a substantial chilling effect.

Hence, we conclude that the City's need to obtain the Tattered Cover invoice in order to identify Suspect A as the occupant of the bedroom is not sufficiently compelling to outweigh the harm to fundamental constitutional rights that would result if the search warrant was executed.

---

**28.** The only objects fingerprinted were the two books, which had no usable prints; the glassware from the methamphetamine lab; and the firearms.

The City's final justification is that proof that Suspect A bought the two books will "connect" him to the crime. The City's argument is somewhat amorphous because it never elaborates on the specific reason as to why the connection exists. At its core, however, the argument rests on the premise that if Suspect A bought the "how to" books, he must have operated the lab.[29] The rationale for this argument is thus directly tied to the contents of the books Suspect A may have purchased. This is precisely the reason that this search warrant is likely to have chilling effects on the willingness of the general public to purchase books about controversial topics.

The dangers, both to Suspect A and to the book-buying public, of permitting the government to access the information it seeks, and to use this proof of purchase as evidence of Suspect A's guilt, are grave. Assuming that Suspect A purchased the books in question,[30] he may have done so for any of a number of reasons, many of which are in no way linked to his commission of any crime. He might have bought them for a friend or roommate, unaware that they would subsequently be placed in the vicinity of an illegal drug lab. He might have been curious about the process of making drugs, without having any intention to act on what he read. It may be that none of these scenarios is as likely as that suggested by the City, that Suspect A bought the books intending to use them to help him make an illegal drug. Nonetheless, Colorado's long tradition of protecting expressive freedoms cautions against permitting the City to seize the Tattered Cover's book purchase record.

We acknowledge that the Tattered Cover invoice helps the City to connect Suspect A to the crime and constitutes "a piece of the evidentiary puzzle." However, because of the strength of other evidence at the City's disposal and because of the substantial chilling effects that are likely to result from execution of the warrant, we hold that the City has failed to demonstrate that its need for this evidence is sufficiently compelling to outweigh the harmful effects of the search warrant.

## V. CONCLUSION

For the reasons discussed above, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

Justice COATS does not participate.

---

29. If the books in question related to an entirely different topic, such as coping with the loss of a loved one, then the connection between the suspect and the illegal drug lab would be significantly more attenuated. Indeed, then we would in essence be addressing the argument discussed above, that the City needs the Tattered Cover invoice because it will help them to place Suspect A at the scene of the crime and identify him as the occupant of the bedroom.

30. We reiterate the Tattered Cover has never disclosed the contents of the relevant invoice, so we do not know what books Suspect A actually purchased.