CURIOUS THEATRE COMPANY, a Colorado non-profit corporation; Paragon Theatre, a Colorado non-profit corporation; and Theatre13, Inc., a Colorado non-profit corporation, Petitioners

v.

COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT and James Martin, its Executive Director, Respondents.

No. 08SC351.

Supreme Court of Colorado,
En Banc.

Dec. 14, 2009.

A. Bruce Jones, Stephen G. Masciocchi, Daniel R. Pabon, Holland and Hart L.L.P., Denver, Colorado, Attorneys for Petitioners.

James W. Hubbell, Kelly Garnsey Hubbell & Lass L.L.C., Denver, Colorado, Attorneys for Amicus Curiae The Thomas Jefferson Center for the Protection of Free Expression.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Robert C. Douglas, First Assistant Attorney General, Lisa Brenner Freimann, Assistant Attorney General, Josh Urquhart, Assistant Attorney General, Denver, Colorado, Attorneys for Respondents.

Edward T. Ramey, Isaacson Rosenbaum P.C., Denver, Colorado, Attorneys for the Dramatists Guild of America and the National Coalition Against Censorship.

Adam M. Platt, Steven D. Zansberg, Levine Sullivan Koch & Schulz, L.L.P., Denver, Colorado, Bruce E.H. Johnson, Noelle H. Kvasnosky, Davis Wright Tremaine L.L.P., Seattle, Washington, Attorneys for Amicus Curiae Theatre Communications Group.

Christopher P. Beall, Levine Sullivan Koch & Schultz, L.L.P., Denver, Colorado, Mark Silverstein, ACLU Foundation of Colorado, Denver, Colorado, Attorneys for Amicus Curiae American Civil Liberties Union of Colorado.

John R. Mann, Kennedy Childs & Fogg P.C., Denver, Colorado, Kurt S. Lewis, Lewis Law Firm, L.L.C., Denver, Colorado, Attorneys for Amicus Curiae Crossroads Theater at Five Points, L.L.C.

Justice COATS delivered the Opinion of the Court.

The non-profit theaters that were plaintiffs below petitioned for review of the court of appeals' judgment affirming the denial of their motion for preliminary injunction. *See Curious Theater Co. v. Colo. Dep't of Pub. Health & Env't,* 216 P.3d 71 (Colo.App.2008). Their action against the Colorado Department of Public Health and Environment seeks both a judgment declaring Colorado's ban on theatrical smoking to be an unconstitutional infringement on their freedom of speech and an order enjoining its enforcement. The district court denied their motion for preliminary injunction on the grounds that smoking, even in the theatrical context, does not amount to expressive conduct of a type that would be subject to either state or federal constitutional protections for speech. The court of appeals concluded that theatrical smoking was expressive conduct but affirmed the district court on the alternative grounds that the ban was nevertheless constitutional.

Even assuming that theatrical smoking actually can amount to protected expressive conduct under some circumstances, the statutory ban does not impermissibly infringe on the plaintiffs' constitutionally protected freedom of expression because it is content neutral and narrowly tailored to serve the state's substantial interest in protecting the public health and welfare. The judgment of the court of appeals is therefore affirmed.

## I.

Three non-profit theater companies, Curious Theatre Company, Paragon Theatre, and Theatre13, Inc., brought a declaratory judgment action against the Colorado Department of Public Health and Environment and its executive director, challenging the constitutionality of the Colorado Clean Indoor Air Act[1] and seeking to enjoin its enforcement against theatrical smoking. The Act prohibits smoking in any indoor area, including a theater, unless the smoking falls within an express statutory exception. The plaintiff-theaters asserted that theatrical smoking can include expressive conduct and that the Act's blanket prohibition against indoor smoking therefore amounts to an impermissible infringement on their freedom of speech, as guaranteed by both the federal and state constitutions.

The district court entertained evidence and the arguments of counsel before denying the plaintiffs' motion for preliminary injunction. At the hearing, the theaters presented the testimony of four witnesses with lengthy and varied professional theatrical experience, to the effect that smoking has been a part of theatrical expression in numerous plays; that the theaters provide advance notice to their audiences if smoking will occur onstage; and that prop or fake cigarettes are inadequate substitutes for real smoking. At the conclusion of this testimony, and without finding any need to receive evidence from the defendant-Department, the district court concluded that the plaintiffs had failed to make a number of the showings required for a preliminary injunction, including, most notably, a showing that they were likely to succeed on the merits of their claim. More specifically,

it found that the plaintiffs had failed to prove that smoking, even in a theatrical context, can amount to expressive conduct to which either federal or state constitutional protections would extend.

The plaintiffs immediately appealed the denial of their motion for preliminary injunction to the intermediate appellate court. Although it disagreed with the district court's conclusion that theatrical smoking is not expressive conduct, the court of appeals nevertheless affirmed the district court's refusal to grant a preliminary injunction, finding that the smoking ban is content neutral and is adequately tailored to meet constitutional requirements for a content-neutral, incidental restriction on expressive conduct.

We granted the plaintiffs' petition for a writ of certiorari challenging the court of appeals' determination that the smoking ban is constitutional.

## II.

First Amendment protections notwithstanding, "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The United States Supreme Court has "often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* Although the "time, place, or manner" test was developed for evaluating restrictions on expression taking place on public property that had been dedicated as a public forum, it has also been applied to conduct occurring in what are essentially places of public accommodation. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion) (also noting previous application of "time, place, or manner" test to conduct occurring on private property

1. §§ 25–14–201 to –209, C.R.S. (2009).

in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).

■ The delivery of messages by conduct that is intended to be, and in context would reasonably be understood to be, communicative has received particular attention in the jurisprudence of the Supreme Court. "Symbolic expression of this kind may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech." *Clark*, 468 U.S. at 294, 104 S.Ct. 3065 (citing *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). While each focuses on slightly different aspects of the inquiry, these two articulations of constitutionally permissible limitations on protected expression have nevertheless been interpreted to embody much the same standards, *see Clark*, 468 U.S. at 298, 104 S.Ct. 3065; *see also City of Colorado Springs v. 2354 Inc.*, 896 P.2d 272, 297 n. 19 (Colo.1995), and have been applied accordingly, *Clark*, 468 U.S. at 299 n. 8, 104 S.Ct. 3065 ("We note that only recently, in a case dealing with the regulation of signs, the Court framed the issue under *O'Brien* and then based a crucial part of its analysis on the time, place, or manner cases.").

Unlike conduct that is regulated or prohibited precisely because of the message it symbolically conveys, *see, e.g., Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (flag burning), it is often unclear whether conduct that is regulated without regard to any message it may convey is in fact "expressive" in a way that would be constitutionally protected. Although the Supreme Court has clearly rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," *O'Brien*, 391 U.S. at 376, 88 S.Ct. 1673; *see also City of Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."), the Court has more than once chosen to simply assume a sufficient "communicative element" in regulated conduct where the regulation in question would pass constitutional muster in any event, *see, e.g., Clark*, 468 U.S. at 296, 104 S.Ct. 3065 ("we have assumed for present purposes that the sleeping [in a national park] banned in this case would have an expressive element"); *O'Brien*, 391 U.S. at 376, 88 S.Ct. 1673 ("even on the assumption that the alleged communicative element in [draft card burning] is sufficient to bring into play the First Amendment"); *cf. Barnes*, 501 U.S. at 565, 111 S.Ct. 2456 (plurality opinion) (" '[A]lthough the customary "barroom" type of nude dancing may involve only the barest minimum of protected expression, we recognized in *California v. LaRue*, 409 U.S. 109, 118, 93 S.Ct. 390, 34 L.Ed.2d 342 ... (1972), that this form of entertainment might be entitled to First and Fourteenth Amendment protection under some circumstances.' " (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975)).

The plaintiffs readily concede that the regulation of smoking in public is within the constitutional power of the government; that it furthers an important governmental interest; and that the governmental interest it furthers is unrelated to the suppression of free expression. They assert only that the ban is not tailored adequately to serve the purpose for which it was adopted, bringing into question not only the extent to which tailoring to the service of a significant governmental interest is required by the First Amendment but also the precise nature of the governmental interest the ban was meant to serve.

■ Unlike a law directed at the content of speech or the communicative nature of conduct, it is not necessary for a content-neutral time, place, or manner restriction, much less the regulation of conduct for reasons completely unrelated to the suppression of free expression, to be justified by "a substantial showing of need," or compelling state interest. *Johnson*, 491 U.S. at 406–07, 109 S.Ct. 2533. Nor must the content-neutral

regulation of expression be limited to the least restrictive or least intrusive means of serving the government's interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798–99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In fact, *O'Brien's* "relatively lenient standard" requires only that any incidental restriction on expressive conduct be no greater than is essential to the governmental interest in regulating the *conduct* at issue. *Johnson*, 491 U.S. at 407, 109 S.Ct. 2533; *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673.

■■■ Expressed otherwise, such content-neutral regulation is valid with regard to any requirement of narrow tailoring so long as the government could reasonably have determined that its interests overall would be served less effectively without that regulation. *Ward*, 491 U.S. at 799, 109 S.Ct. 2746. If the government has a legitimate interest in protecting the welfare of its citizens, and if the welfare of those citizens would be more exposed to harm without a particular regulation of conduct than with it, the regulation is safe from invalidation under the First Amendment. *See Clark*, 468 U.S. at 297, 104 S.Ct. 3065 ("If the Government has a legitimate interest in ensuring that the National Parks are adequately protected, which we think it has, and if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment as a reasonable regulation of the manner in which a demonstration may be carried out.").

Although the Supreme Court has on occasion required some demonstration of an evidentiary basis to connect the government's asserted rationale for regulating expressive conduct with the particular regulation itself, *see, e.g., Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), it has also made clear that this connection may be apparent, plain, or beyond doubt, without specific evidentiary support, *see, e.g., Clark*, 468 U.S. at 299, 104 S.Ct. 3065 (acknowledging that a substantial governmental interest in conserving park property is plainly served by preventing overnight sleeping); *O'Brien*, 391 U.S. at 381, 88 S.Ct. 1673 (finding "apparent" the governmental interest in maintaining the continued availability of draft cards and "equally clear" that the prohibition against draft-card destruction protects this interest); *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."). In *City of Erie v. Pap's A.M.*, this issue was brought into focus by Justice Souter's partial dissent, which questioned whether establishments featuring dancers forced to wear "pasties" and "G-strings" would have a markedly different effect on neighborhoods from establishments whose dancers were completely nude. 529 U.S. 277, 314–17, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (Souter, J., concurring in part and dissenting in part). The judgment of a four-justice plurality, rejecting Justice Souter's call for a firmer evidentiary connection, was joined by two additional justices who would not subject "a general law regulating conduct and not specifically directed at expression" to any First Amendment scrutiny at all. *Erie*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265; *id.* at 307–08, 120 S.Ct. 1382 (Scalia, J., joined by Thomas, J., concurring in the judgment).

■■■ We consider it unnecessary to determine whether smoking in the theatrical context might in some cases contain an expressive element because we think it clear that, in any event, the statutory smoking ban at issue here withstands the plaintiffs' assertions that it is insufficiently tailored. The plaintiffs assert that the smoking ban is insufficiently tailored to satisfy the requirements of the Supreme Court's First Amendment jurisprudence for three distinct, but related, reasons. They contend that: 1) the declared governmental interest in banning indoor smoking is more limited than was appreciated by the appellate court when it found the ban to be adequately tailored to the government's interest; 2) the record is devoid of any factual justification for a ban on theatrical smoking; and 3) the record does not support the appellate court's determination that the ban leaves open adequate alternate means of expression. .

With regard to the government's interest, the plaintiffs assert that the General Assembly's use of the words "involuntary exposure" in its declaration [2] evidences its limited purpose of protecting only those who would choose to avoid places of public accommodation if forewarned that smoking would occur on the premises and, consequently, the General Assembly's failure to tailor its own regulatory scheme to that end. Apart from the fact that this interpretation of the term "involuntary" is, as a matter of statutory construction, simply untenable, the argument itself confounds the governmental interest to be served by regulating particular conduct with the method or approach chosen by the legislature to further that interest.

In the abstract, the term "involuntary," could have a number of different meanings. It could refer to a choice subject to any variety of external or internal pressures or, for that matter, to action devoid of any conscious choice whatsoever. Therefore, its precise meaning must be derived from the context, or statutory scheme, in which it appears. *See Walgreen Co. v. Charnes*, 819 P.2d 1039, 1043 & n. 6 (Colo.1991) (applying the rule that statutes relating to the same subject matter be construed in pari materia, gathering the legislative intent from the whole of the enactments). Were the term "involuntary exposure" restricted to exposure that could not be avoided by merely avoiding places where smoking is known to occur, as the plaintiffs propose, rather than encompassing any exposure to the smoking of others that must be endured as a cost of enjoying the benefits of places of public accommodation, the purpose would be met in all cases by the mere posting of warnings, which would render the legislative ban on indoor smoking entirely superfluous. While the intended meaning of an ambiguous stat-

ute might be clarified by reference to an unambiguous declaration of legislative purpose, *see, e.g., Vensor v. People*, 151 P.3d 1274, 1277 (Colo.2007), it would make little sense to construe an ambiguous declaration of purpose as having a meaning that renders the legislature's specific proscriptive provisions themselves superfluous and, in this case, unconstitutional, *see Catholic Health Initiatives Colo. v. City of Pueblo*, 207 P.3d 812, 822 (Colo.2009) (the court has an obligation to avoid statutory interpretations that invoke constitutional deficiencies).

Perhaps more to the point, however, the legislative declaration in this case expressly states that the Act's purpose is "to preserve and improve the health, comfort, and environment of the people of this state by limiting exposure to tobacco smoke." § 25–14–203. The determination of the General Assembly that "it is in the best interest of the people of this state to protect nonsmokers from involuntary exposure to environmental tobacco smoke in most indoor areas open to the public," when read in context, evidences the balance struck "between the health concerns of nonconsumers of tobacco products and the need to minimize unwarranted governmental intrusion into" private choices— not its purpose or interest. *Id.* Rather than contradicting itself or obtusely failing to grasp that its regulatory scheme was wholly unnecessary to its purpose, it seems abundantly clear that the General Assembly's purpose was to protect its citizens from exposure to the smoking of others without at the same time forcing them to choose between their comfort or health, on the one hand, and the benefits offered by regulated, public accommodations, on the other.

With regard to the demonstration of an evidentiary connection between the government's rationale for regulating this conduct

---

2. Legislative Declaration, § 25–14–202 ("The general assembly hereby finds and determines that it is in the best interest of the people of this state to protect nonsmokers from involuntary exposure to environmental tobacco smoke in most indoor areas open to the public, public meetings, food service establishments, and places of employment. The general assembly further finds and determines that a balance should be struck between the health concerns of nonconsumers of tobacco products and the need to minimize unwarranted governmental intrusion into, and regulation of, private spheres of conduct and choice with respect to the use or non-use of tobacco products in certain designated public areas and in private places. Therefore, the general assembly hereby declares that the purpose of this part 2 is to preserve and improve the health, comfort, and environment of the people of this state by limiting exposure to tobacco smoke.").

and its chosen means of doing so, there can simply be no question but that the state's legitimate interest in preserving and improving the health, comfort, and environment of the public is furthered by limiting the public's exposure to environmental smoke, even from tobacco-free alternatives.[3] This is apparent without reliance on empirical studies detailing particular health risks associated with breathing second-hand smoke. Apart from its interest in the public's physical health, the State has "a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression" sufficient to justify a content-neutral restriction on expression. *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805–07, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *see also Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954) ("The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." (citation omitted) ). As was the case with maintaining the availability of draft cards by prohibiting their destruction, *see O'Brien,* 391 U.S. at 381, 88 S.Ct. 1673, and conserving park property by banning overnight camping, *see Clark,* 468 U.S. at 299, 104 S.Ct. 3065, the connection between limiting exposure to environmental smoke and banning indoor public smoking in places of public accommodation is apparent without further evidentiary support.

Finally, with regard to their contention that the smoking ban permits no ample alternative channels of expression, the plaintiffs' argument fails to appreciate that a general law regulating only conduct, no matter how symbolically expressive that conduct may be, by definition leaves unregulated the communication of any intended message by actual speech, writing, or publication. Perhaps for this reason, the Supreme Court has never included a separate requirement for alternate channels of communication in its standard for regulating expressive conduct, as it has in its standard for time, place, or manner restrictions generally. *See, e.g., Clark,* 468 U.S. at 293–94, 104 S.Ct. 3065. Even with respect to time, place, or manner restrictions on constitutionally protected speech itself, however, the Supreme Court has required only that otherwise narrowly-tailored, content-neutral restrictions also leave open "ample alternative channels for communication of the information," *see id.* at 293, 104 S.Ct. 3065, not alternative channels with equivalent dramatic impact.

Accepting that there may exist certain kinds of expressive conduct for which actual speech could not provide an adequate substitute, such as erotic dancing, the Supreme Court has made clear that regulations limiting the full expressive impact of such conduct can nevertheless comport with the First Amendment. *See Erie,* 529 U.S. at 301, 120 S.Ct. 1382 (plurality opinion) (although prohibiting full nudity, a law permitting dancers wearing "pasties" and "G-strings" leaves open ample alternative channels of expressing the message of erotic dancing). Whether or not the use of a fake or prop cigarette can have precisely the same dramatic impact or convey the same degree of realism as an actual, burning, smoke-producing cigarette, it, like the theatrical use of substitutes for virtually every other type of dangerous or illegal conduct, is capable of amply communicating to an audience an intended message. Especially in the context of a theatrical performance, where the message is typically conveyed by imitation rather than by scientific demonstration, some resultant lack of realism cannot be considered fatal to the regulation of conduct.

Because it is clear, without further evidentiary support, that the state has a significant interest in protecting the health and welfare of its citizens and that the welfare of those citizens would be more exposed to harm without the smoking ban than with it, the ban is adequately tailored for purposes of the First Amendment to the United States Constitution.

---

**3.** For purposes of the Colorado Clean Indoor Air Act, tobacco is defined to include "cloves and any other plant matter or product that is packaged for smoking." § 25–14–203(17).

## III.

The guarantees of the First Amendment are applicable to the states through the Due Process Clause of the Fourteenth Amendment, *Douglas v. City of Jeannette*, 319 U.S. 157, 162, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); *Marco Lounge, Inc. v. City of Federal Heights*, 625 P.2d 982, 983 n. 1 (Colo.1981), and the Supremacy Clause of the Federal Constitution establishes their precedence over conflicting state constitutional provisions. Like other protections of the Bill of Rights, however, the First Amendment limits the power of the federal and state governments to abridge individual freedoms, not the power of states to even further restrict governmental impairment of those individual freedoms. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 80–81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Bock v. Westminster Mall Co.*, 819 P.2d 55, 59 (Colo. 1991). The plaintiffs assert that article II, section 10 of the Colorado Constitution is more restrictive of the enactment of laws regulating expressive conduct than the First Amendment.

This court is the final arbiter of the meaning of the Colorado Constitution, and as such, it is clearly within its power to determine that the state constitution places restrictions on legislative action even greater than those imposed by the Federal Constitution. In the past, we have, however, generally declined to construe the state constitution as imposing such greater restrictions in the absence of textual differences or some local circumstance or historical justification for doing so. Simply disagreeing with the United States Supreme Court about the meaning of the same or similar constitutional provisions, even though we may have the power to do so, risks undermining confidence in the judicial process and the objective interpretation of constitutional and legislative enactments.

With regard to constitutional guarantees of freedom of speech, the text of article II, section 10 actually differs from that of the First Amendment. In addition to prohibiting, in very similar terms, the enactment of laws "abridging" or "impairing" the freedom of speech, the state constitution goes on to affirmatively guarantee the freedom of every person "to speak, write, or publish whatsoever he will on any subject," without prior approval or restraint, subject only to being held accountable for any abuse of that liberty. *See generally* Thomas M. Cooley & Walter Carrington, 2 *Cooley's Constitutional Limitations* 876–98 (8th ed.1927) (collecting numerous similar state constitutional provisions and emphasizing their departure from the wide-spread acceptance of prior restraints on publication that existed at common law). Noting this textual difference, we have at times characterized the state constitution as providing greater protection for individual freedom of expression than the Federal Constitution. *See, e.g., Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1054 (Colo.2002); *Bock*, 819 P.2d at 58. We have, however, rarely, if ever, construed article II, section 10 to circumscribe more narrowly than the First Amendment the regulatory powers of government.

Although we may not have initially intended to interpret article II, section 10 as deviating from First Amendment mandates on the issue, we have continued to demand proof by clear and convincing evidence of actual malice before a private individual may recover under the law of libel in all matters of public interest, even after learning that the Federal Constitution would extend this evidentiary requirement no further than allegations of libel by public figures. *See Walker v. Colo. Springs Sun, Inc.*, 188 Colo. 86, 98, 538 P.2d 450, 457 (1975) (adopting greater protections without reference to the Colorado Constitution and specifically qualifying its reliance on another court that reached the same result by noting that the other court "relied in some part upon a state constitutional provision"); *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1109 (Colo. 1982) (concluding that *Walker* must have been based on article II, section 10, and conforming the *Walker* protections for statements related to public issues to the federal standard for statements about public officials). We have also enforced the protections of article II, section 10 against certain nongovernmental entities by interpreting the concept of "state action" more generously than would the Supreme Court with respect

to the First Amendment. *Bock,* 819 P.2d at 60. And although we expressly rejected an invitation to follow the lead of at least one other jurisdiction with similarly broad protections for freedom of speech and to find obscenity to be a form of constitutionally protected speech, we nevertheless held that "obscenity" must be limited to materials that cannot be "tolerated" by the community, whether or not a community standard of "acceptance" might ultimately be found adequate to satisfy the requirements of the First Amendment. *People v. Ford,* 773 P.2d 1059, 1066 (Colo.1989).

Finally, we have relied on the broader protections of both sections 7 and 10 of article II to impose a more onerous burden on law enforcement investigations seeking specific customer purchase records from innocent, third-party bookstores than would be required by the Fourth Amendment of the Federal Constitution. *Tattered Cover,* 44 P.3d at 1056. In doing so, however, we made clear that we considered the imposition of a "strict scrutiny" or "compelling need" requirement on this kind of "search" to be justified by the state constitution only because the purchase records were sought specifically to discover the content or ideas contained in a particular customer's reading material. *Id.* at 1057 n. 23, 1059. *Contra Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591, 612 (2002) (requiring strict scrutiny whenever protected expression is involved, even if the regulation is content neutral).

With respect to content-neutral time, place, or manner regulations and the regulation of conduct incidentally affecting symbolic expression, by contrast, we have applied the four-part test of *O'Brien* to uphold legislation against challenges under both the First Amendment and article II, section 10, without suggesting any distinction between the two. *See 7250 Corp. v. Bd. of County Comm'rs,* 799 P.2d 917, 924–28 (Colo.1990) (regulation of conduct); *Williams v. City and County of Denver,* 622 P.2d 542, 546 (Colo. 1981) (time, place, and manner regulations). And we see no basis in the text of article II, section 10, or in local circumstance or history, for departing from this precedent.

IV.

Because the Colorado Clean Indoor Air Act is content neutral and narrowly drawn to further the state's substantial interest in protecting the public health and welfare, its prohibition of smoking, even in the theatrical context, does not impermissibly infringe on the plaintiffs' constitutionally protected freedom of expression, as guaranteed by either the federal or state constitution. The judgment of the court of appeals is therefore affirmed.

Justice HOBBS dissents.

Justice HOBBS, Dissenting.

I would reverse the court of appeals' judgment and hold that the smoking ban contained in the Colorado Clean Indoor Air Act, as applied to theatrical performances when the script of a play calls for smoking, is unconstitutional because theatrical smoking constitutes expressive conduct protected by the First Amendment. Under the applicable constitutional standard, the state must carry its burden of demonstrating that its prohibition of expressive conduct is narrowly tailored to meet a significant governmental interest. *See Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 298, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (applying the *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) test); *Denver Publ'g Co. v. City of Aurora,* 896 P.2d 306, 312–17, 319 (Colo.1995).

In this case, the state has failed to meet its burden because the smoking ban leaves the theaters without adequate alternate channels for their expression. *See Denver Publ'g,* 896 P.2d at 316–17. The majority finds the fourth *O'Brien* factor, requiring that the ban be narrowly tailored, has been satisfied because adequate alternatives exist for the expressive conduct under *Clark,* 468 U.S. at 293, 296–99, 104 S.Ct. 3065, and *Denver Publishing,* 896 P.2d at 313–17. I respectfully disagree.

Colorado's smoking ban is not narrowly tailored as applied to theatrical performances that call for smoking because the statutory ban bars the use of any plant matter in

addition to products of the tobacco plant, fails to take into account measures that limit exposure to patrons of the theater to demonstrably harmful tobacco products, and renders alternative means of the protected First Amendment expression untenable and even laughable.

## A. Theatrical Smoking Is Expressive Conduct

Live drama, no less than written or spoken word, can communicate "pungent social and political commentary." *See Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 563–64, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (Douglas, J., dissenting in part and concurring in part). Thus, theater as a medium is afforded First Amendment protection. *See id.* at 557–58, 95 S.Ct. 1239 (majority opinion).

In order to determine whether smoking within theatrical performances is conduct that is sufficiently expressive to be protected under the First Amendment, the court must determine whether (1) "an intent to convey a particularized message was present" and (2) "the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (quotations and citations omitted). Smoking by itself is not expressive conduct. *NYC C.L.A.S.H., Inc. v. City of New York,* 315 F.Supp.2d 461, 476 (S.D.N.Y.2004). However, smoking by performers in a play when a script calls for it meets the *Johnson* test.

With respect to the first prong of the *Johnson* test, witnesses with extensive theatrical experience testified before the trial court that smoking is included by playwrights to develop character and plot. One witness testified that "[smoking]'s at the very, very core of character development and storytelling.... [I]t's as necessary as if a character is a soldier and is supposed to have a gun in their hand."

The theaters point to a specific upcoming production of *tempODYSSEY,* a play in which a character initially smokes, then realizes he has died because he can no longer smoke. The script describes this dramatic moment:

[CHARACTER]: It's over. All over.

([CHARACTER] pulls out his smokes, still crying, sticks one in his mouth and tries to light up. Nothing. He inhales harder. Nothing. He throws it to the ground, pulls out another, lights up, nothing.... He squashes his cigarettes one by one)

[CHARACTER]: No smoke. No air. No breath. No scream. No sound.

Dan Dietz, *tempODYSSEY* 49 (Dramatists Play Service, Inc.) (2007).

The theaters also point to other plays that utilize smoking as a tool for expressing character and story, such as *Who's Afraid of Virginia Woolf?* by Edward Albee, *The Graduate* adapted for theater by Terry Johnson, *A Moon for the Misbegotten* by Eugene O'Neill, *Mojo* by Jez Butterworth, and *Vieux Carre* by Tennessee Williams. For example, in *Who's Afraid of Virginia Woolf?*, a main character, George, uses the cloud of cigarette smoke on stage as a descriptive tool:

GEORGE: I'm forty-something. (Waits for reaction ... gets none.) Aren't you surprised? I mean ... don't I look older? Doesn't this *gray* quality suggest the fifties? Don't I sort of fade into backgrounds ... get lost in cigarette smoke?

Edward Albee, *Who's Afraid of Virginia Woolf?* 19 (Dramatists Play Service, Inc., Rev. Ed.2004) (1962).

In *The Graduate,* the exhale of smoke shows the character Mrs. Robinson's power over young Benjamin:

MRS. ROBINSON: ... I'll get undressed now. Is that alright?

BENJAMIN: Sure. Fine.

([MRS. ROBINSON] stands up, takes a last pull on her cigarette and turns to put it out. BENJAMIN moves closer and kisses her. When their lips part she exhales her cigarette smoke. She takes off her jewelry then begins to unbutton her blouse.)

Terry Johnson, *The Graduate* 32 (Samuel French, Inc.2003) (2000).

As the court of appeals points out, theatrical smoking can be used to make political statements about smoking itself. *Curious Theater Co. v. Colo. Dep't of Pub. Health &*

*Env't,* 216 P.3d 71, 79 (Colo.App.2008); *see* David Conrue, Sam Holtzapple, Warren Loy, & Chris Todd, *Smoking Bloomberg,* http://www.smokingbloomberg.com (last visited Dec. 9, 2009) (a Broadway musical comedy about New York City Mayor Michael Bloomberg's ban on smoking tobacco in public places, which has been described as "explor[ing] the loss of personal freedoms in modern-day America, targeting the Left, the Right, and everyone in between." Kenneth Jones, *Smoking Bloomberg, the Musical, Gets Transport Group Reading in NYC April 22,* Playbill, Apr. 22, 2009, http://www.playbill.com/news/article/128495–Smoking_Bloomberg_the_Musica L_Gets_Transport_Group_Reading_in_NYC_April_22 (last visited Dec. 9, 2009)).

In a play's performance, smoking becomes a form of expression that is distinct from the act of smoking itself; it is used to communicate meaning and thus "to convey a particularized message." *See Johnson,* 491 U.S. at 404, 109 S.Ct. 2533. The characters and plots would lack depth and expressive force without the hovering smoke on stage, the poignant exhale of a puff of smoke, and even the ability or inability to smoke.

"Would Mrs. Robinson be as much of a smoldering volcano in 'The Graduate' if she could not wave her cigarette so suggestively? Would George and Martha's living room broadsides in 'Who's Afraid of Virginia Woolf?' be equally vicious without their boozy veil of smoke?" Kirk Johnson, *Colorado Court Rules "No Smoking" Means Exactly That, Even on Stage,* N.Y. Times, Mar. 21, 2008, *available at* http://www.nytimes.com/2008/03/21/us/21smoke.html.

The second prong of the *Johnson* test requires that at least some of the audience perceive that theatrical smoking has some message, even if the audience does not comprehend its intended point. *See Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1270 (11th Cir.2004); *see also Hurley v. Irish–Am. Gay, Lesbian & Bisexual Group of Boston,* 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) ("[A] narrow, succinctly articulable message is not a condition of constitutional protection," and if First Amendment protection were so defined, it "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll.").

It is reasonable that some audience members would perceive a message from the use of cigarette, cigar, or pipe smoking in such plays as described above. *See Holloman,* 370 F.3d at 1270. Therefore, the *Johnson* test is satisfied; theatrical smoking is expressive conduct for First Amendment purposes.

Once the conduct is proven to be expressive, *O'Brien* applies. *See* 391 U.S. at 377, 88 S.Ct. 1673. Here, the theaters agree with the state that *O'Brien's* first three factors are met: (1) Colorado's legislature has the authority to enact statutes, such as the smoking ban, that promote public health; (2) the legislature's purpose in enacting the smoking ban, to protect the health of the state's citizens, § 25–14–202, C.R.S. (2009), serves an important governmental interest; and (3) the smoking ban is content neutral.

In this case, the majority finds the fourth *O'Brien* factor, requiring that the ban be narrowly tailored, has been met and adequate alternatives exist for the expressive conduct under *Clark,* 468 U.S. at 293, 296–99, 104 S.Ct. 3065, and *Denver Publishing,* 896 P.2d at 313–17. I disagree. A closer analysis of the statute and an assessment of the available alternatives to theatrical smoking reveal that the majority's conclusion is untenable.

**B.  Colorado's Smoking Ban Is Not Narrowly Tailored**

The Colorado Clean Indoor Air Act bans all smoking of tobacco in any indoor area, including theaters. § 25–14–204(1)(x), C.R.S. (2009). The legislative declaration states the statute is meant to effectuate a balance to protect nonsmokers from involuntary exposure to tobacco smoke and unwarranted governmental intrusion:

> The general assembly hereby finds and determines that *it is in the best interest of the people of this state to protect nonsmokers from involuntary exposure to environmental tobacco smoke in most indoor ar-*

*eas open to the public,* public meetings, food service establishments, and places of employment. *The general assembly further finds and determines that a balance should be struck between the health concerns of nonconsumers of tobacco products and the need to minimize unwarranted governmental intrusion into, and regulation of, private spheres of conduct and choice with respect to the use or nonuse of tobacco products in certain designated public areas and in private places.* Therefore, the general assembly hereby declares that the purpose of this part [ ] is to preserve and improve the health, comfort, and environment of the people of this state by limiting exposure to tobacco smoke.

§ 25–14–202 (emphasis added). However, the statute goes on to broadly define "tobacco" to include any "plant matter or product that is packaged for smoking." § 25–14–203(17), C.R.S. (2009) (" 'Tobacco' also includes cloves and any other plant matter or product that is packaged for smoking."). The state has failed in this case to prove that the ban is narrowly tailored to allow adequate alternative means of expression for theatrical performances.

Colorado's ban on indoor smoking is among the most restrictive in the country. Of the twenty-four states that have indoor smoking bans, at least twelve have exemptions for theatrical performances or grant exemptions on a case-by-case basis. *See Curious Theater,* 216 P.3d at 75–76. Only three states, in addition to Colorado, ban theatrical smoking and also ban smoking of cigarettes made from cloves, tea leaves, or other tobacco alternatives. *See, e.g.,* N.J.Rev.Stat. §§ 26:3D–57, –59 (2009); Mont.Code Ann. §§ 50–40–103(8), –104 (2009); Wash. Rev. Code § 70.160.020 (2009).

Despite the especially broad ban on smoking in Colorado, airport smoking concessions are exempted. § 25–14–205(1)(f), C.R.S. (2009). This exemption is not justified by the stated legislative purpose of the smoking ban and, in fact, works against this stated purpose. *See* § 25–14–202 ("the purpose of [the ban] is to preserve and improve the health, comfort, and environment of the peo-

ple of this state by limiting exposure to tobacco smoke"). In contrast, other exemptions, such as the exemption for hotel rooms, § 25–14–205(1)(c), clearly work towards the legislature's goal of striking a balance "between the health concerns of nonconsumers of tobacco products and the need to minimize unwarranted governmental intrusion into, and regulation of, private spheres of conduct," § 25–14–202.

To be narrowly tailored to serve a content-neutral purpose, the state's regulation "need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The state must prove that the regulation promotes a government interest that would be achieved less effectively absent the restriction. *Id.* at 799, 109 S.Ct. 2746; *Denver Publ'g,* 896 P.2d at 314, 319. Nonetheless, "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward,* 491 U.S. at 799, 109 S.Ct. 2746. "A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz,* 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

The state bears the burden of proving that the smoking ban's incidental burden on expressive theatrical conduct is narrowly tailored. *See Denver Publ'g,* 896 P.2d at 319. Contrary to the majority's contention that no specific evidentiary support is necessary to justify the statute here, maj. op. at 548, we have held that the quantum of evidence required for a statute to withstand constitutional review is necessarily included within the constitutional test. *Denver Publ'g,* 896 P.2d at 319 n. 20; *see also City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 416, 416 n. 12, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) ("[S]ince the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require."). Thus, the state must demonstrate that its prohibition against smoking tobacco-free alternatives is narrowly tailored to the state's interest in the public's health, safety, and

comfort. *See Denver Publ'g,* 896 P.2d at 319. The state has not carried this burden.

The state presented several exhibits to the trial court dealing with the health consequences of smoking; however, the state provided no support for the claim that the smoking of or secondhand smoke from tobacco-free alternatives poses a public health risk. The state's exhibits included the Surgeon General's 2006 report on the health consequences of tobacco smoke. Def.'s Ex. D. However, this highly reputable report considered only the effects of secondhand smoke from tobacco cigarettes and not their tobacco-free counterparts. *Id.*

The state also provided three exhibits touting the health hazards of herbal or "alternative" cigarettes. The first is a press release from the Federal Trade Commission ("FTC") regarding a settlement reached between the FTC and companies selling tobacco-free herbal cigarettes. Def.'s Ex. G. The FTC alleged that the companies "falsely implied that smoking [ ] herbal cigarettes did not pose the health risks associated with smoking tobacco cigarettes." *Id.* In response to this claim, the companies agreed to disclose that herbal cigarettes are dangerous to health in future advertising. *Id.* Not only did this news release not cite any studies or scientific information relating to the health risks of herbal cigarettes, but a settlement agreement can hardly be used as evidence supporting the government's position that the secondhand smoke from tobacco-free alternatives poses a risk to the public health.[1]

The second exhibit is from the website http://www.yourhealthconnection.com and relies heavily on the FTC's settlement order; however, the exhibit cites no scientific studies in support of the state's claims. Def.'s Ex. F.

The final exhibit dealing with herbal cigarettes is a briefing by an advocacy group, ASH Scotland, to the Health Minister of Scotland advocating the inclusion of non-tobacco products in legislation banning environmental tobacco smoke. Def.'s Ex. H. ASH Scotland admits in its briefing that peer-reviewed, published evidence on non-tobacco cigarettes is sparse, but goes on to rely on a 1990 Australian study that found some similarities between tobacco and non-tobacco cigarettes. *Id.* However, evidence of non-tobacco products' connection to adverse public health effects is lacking.

The majority asserts that "there can simply be no question but that the state's legitimate interest in preserving and improving the health, comfort, and environment of the public is furthered by limiting the public's exposure to environmental smoke, even from tobacco-free alternatives." Maj. op. at 550. Dispensing with any requirement for a factual showing, the majority posits that the state has an "aesthetic interest" in banning the on-stage smoking of non-tobacco products, even "without reliance on empirical studies detailing particular health risks associated with breathing second-hand smoke." *Id.* at 549–50. The majority goes on to state that the legitimacy of this aesthetic interest is "apparent." *Id.* at 550.

However, the state in this case has not claimed an aesthetic interest in banning actors from smoking non-tobacco plant matter; rather, it contends that smoking the available alternatives adversely affects the public's health, safety, and comfort. In my view, in the absence of evidentiary support, the majority's use of aesthetic grounds to totally ban on-stage smoking constitutes censorship in violation of the First Amendment. What other aspects of Mrs. Robinson's dress, speech, or actions might be considered unacceptable on aesthetic grounds? *See Se. Promotions,* 420 U.S. at 563, 95 S.Ct. 1239 (Douglas, J., dissenting in part and concurring in part) ("As soon as [the government is] permitted to pick and choose ... between those productions which are 'clean and healthful and uplifting' in content and those which are not, the path is cleared for a regime of censorship under which full voice can be given only to those views which meet with the approval of the powers that be.").

Our cases require evidentiary support to justify the regulation of expressive conduct. *See Denver Publ'g,* 896 P.2d at 319. This

---

1. The press release included a disclaimer that "[a] consent agreement is for settlement purposes only and does not constitute an admission of a law violation." *Id.*

requirement protects First Amendment expression by imposing a burden of proof involving a convincing factual presentation. The authority cited by the majority does not support the claim that an aesthetic interest, by itself, is sufficient to justify a ban on expressive conduct. *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), stands only for the proposition that a state has a legitimate interest in advancing aesthetic values. Such an interest does not relieve the state from proving that its regulation is narrowly tailored to that interest. The majority also relies on *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), in which the U.S. Supreme Court evaluated the state's interest in the public welfare in the completely unrelated context of an eminent domain proceeding.

Taken together, the state's exhibits provide only conjectural support for its claim that the ban of tobacco-free cigarettes in theatrical performances is narrowly tailored to the government's interest in protecting the public. Thus, I would hold that the state has not met its burden of proving that any plant matter in addition to tobacco "is an appropriately targeted evil." *See Frisby,* 487 U.S. at 485, 108 S.Ct. 2495. Moreover, Colorado's smoking ban is not narrowly tailored because the burden it places on theatrical smoking does not further the state's goal of "protect[ing] nonsmokers from *involuntary* exposure to environmental tobacco smoke." § 25–14–202 (emphasis added).

The theaters proved to the trial court that no audience member would be forced involuntarily to attend a play or inhale second-hand smoke. Patrons of the theaters typically buy tickets in advance rather than showing up on a given night, and advertisements for the plays generally make clear when smoking will occur on stage. The theaters offer warnings about the smoking at the time the ticket is sold and directly prior to the performance, and they offer refunds to any person choosing to forego viewing the play after being

notified of the theatrical smoking. Additionally, when advertising to the acting community for roles that may require smoking on stage, directors disclose this requirement, leaving it up to the actor to decide whether or not to audition.[2]

The argument that such a scheme "forc[es] [citizens] to choose between their comfort or health, on the one hand, and the benefits offered by regulated, public accommodations, on the other," maj. op. at 549, fails to account for the unique nature of theatrical productions. Exposure to smoke during theatrical productions is by performers engaged in expression, while exposure to smoke from fellow patrons at places of public accommodation involves no expression whatsoever.

Moreover, exposure to smoke during theatrical performances is limited because the onstage smoking takes place at a distance from the audience and scripts usually require the smoking of one cigarette or less.[3] A ban on smoking by theater patrons would strike the balance the legislature intended between protecting public health and avoiding overly intrusive governmental regulation, *see* § 25–14–202, while allowing expressive conduct by the actors in theatrical performances.

In *Ward,* the U.S. Supreme Court held New York City's requirement that performers at an outdoor amphitheatre in Central Park use the city's sound equipment and the city's sound technician to be narrowly tailored to the city's substantial interest in noise control. 491 U.S. at 800, 109 S.Ct. 2746. The sponsors of a rock concert contended that this requirement "targets more than the exact source of the 'evil' it seeks to remedy." *Id.* at 801, 109 S.Ct. 2746. The Court disagreed. *Id.* at 801–02, 109 S.Ct. 2746.

However, the Court distinguished the following situation from the one at issue in that case: "If the city's regulatory scheme had a substantial deleterious effect on the ability of bandshell performers to achieve the quality of sound they desired, [the rock concert

---

**2.** The theaters contend that these practices were common prior to the smoking ban and are how they would manage theatrical smoking in the future.

**3.** The theaters' witnesses testified before the trial court that the maximum amount of smoking for any play was fifteen to twenty minutes spread out over two hours.

sponsor]'s concerns would have considerable force." *Id.* at 801, 109 S.Ct. 2746. Thus, if the quality of a performance is substantially affected by the state's regulation, the argument that the regulation is narrowly tailored loses credibility.

In this case, the state's ban on theatrical smoking presents the situation the Court distinguished in *Ward.* Here, the smoking ban has a substantial effect on the ability of the theaters to achieve the intended effect of theatrical performances that include smoking, so much so that the theaters would choose not to present those performances where smoking was integral to the characters or plot.

The theaters demonstrated that they would be contractually precluded from presenting theatrical performances that include smoking where the playwrights require strict adherence to the script. This chilling effect on theatrical expression is unacceptable under the First Amendment. Permitting smoking in theatrical performances would achieve the government's interest in public health no less effectively because citizens could choose to forego plays that include smoking, actors could refrain from auditioning for smoking roles if they prefer, and, in any event, the exposure to secondhand smoke from theatrical smoking is minimal.

The substantial effect on the ability of the theaters to present some plays at all and, otherwise, on their ability to present authentic theatrical performances according to the playwrights' intent demonstrate that Colorado's smoking ban "targets more than the exact source of the 'evil' it seeks to remedy." *See Frisby,* 487 U.S. at 485, 108 S.Ct. 2495.

Other states have avoided a First Amendment violation by narrowly tailoring their smoking bans to ensure that expressive conduct during theatrical performances is not prohibited or by allowing alternatives to smoking tobacco. Colorado's ban does not exempt theaters, and it prohibits the smoking of tobacco alternatives, such as cloves or tea leaves, which are often used instead of tobacco products during theatrical perform-

ances.[4] *See* § 25–14–203(17); *see also* Zachary Pincus–Roth, *No Smoking in the Theater, Especially Onstage,* N.Y. Times, Jan. 28, 2007, *available at* http://www. nytimes.com/2007/01/28/the-ater/28pinc.html?_r=1 & scp=1 & sq=pincus-rothñošmoking & st=cse.

In contradiction to Colorado's theatrical smoking ban is the unjustified exemption for airport smoking concessions. *See* § 25–14–205(1)(f). There is no constitutional right at stake in the airport context, yet smoking is allowed. *See id.; see also NYC C.L.A.S.H.,* 315 F.Supp.2d at 478–79 (holding that smoking in a public indoor establishment such as a bar or restaurant does not constitute expressive speech under the First Amendment because a smoker's motivation in that context is generally not to convey a message).

Despite the majority's confusion about whether an analysis of alternate channels of communication is appropriate when the law in question regulates only conduct, maj. op. at 550, the Supreme Court has expressly applied the alternate channels of communication analysis to cases involving expressive conduct. *Clark,* 468 U.S. at 295, 104 S.Ct. 3065 (assessing the alternatives to the symbolic expression of individuals sleeping overnight in a national park to demonstrate the plight of homelessness); *Ward,* 491 U.S. at 802, 109 S.Ct. 2746 (applying the alternatives analysis to a city regulation that allowed city control of a rock concert's sound mix). Where sufficient alternatives to the prohibited expressive conduct are available, the regulation can withstand constitutional scrutiny. *See Denver Publ'g,* 896 P.2d at 316–17.

The majority opinion fails to appreciate the communicative nature of smoking during theatrical performances. It holds that a fake or prop cigarette "is capable of amply communicating to an audience an intended message." Maj. op. at 550. Talcum cigarettes work by the actor blowing into the cigarette to cause a puff of talcum powder to be excreted. There is some debate whether talcum cigarettes can be used for more than the first

**4.** Actors that do not smoke often prefer tobacco-free cigarettes because they lack the addicting chemical nicotine, and the theaters testified that

they also use tobacco-free cigarettes for the comfort of their patrons.

puff of smoke. In any event, talcum cigarettes do not allow the actor to exhale smoke, since no smoke is actually inhaled. Prop cigarettes emit no smoke at all.

A single puff of talcum powder, or a prop cigarette with a reflective tip or light placed at the tip, can hardly depict the "boozy veil of smoke" necessary to *Who's Afraid of Virginia Woolf?*. *See* Kirk Johnson, *Colorado Court Rules "No Smoking" Means Exactly That, Even on Stage*, N.Y. Times, Mar. 21, 2008, *available at* http://www.nytimes.com/2008/03/21/us/21smoke.html. Neither prop nor talcum cigarettes allow an actor to dramatically exhale a puff of smoke, as Mrs. Robinson does in *The Graduate*. One of the witnesses at trial testified that the audience had responded to a fake cigarette with laughter, though the author intended no comedy.

The ability of a theatrical performance to communicate a plot, depict characters, and evoke an era according to the playwright's intent is severely limited by the inability to light a cigarette, pipe, or cigar on stage. Colorado's smoking ban lacks an exemption for the expressive conduct of theatrical smoking, allows no adequate alternative to theatrical smoking, and prohibits the smoking of tobacco alternatives. Thus, it is not narrowly tailored to meet the state's legitimate interest in protection of the public's health, safety, and comfort.

Accordingly, I respectfully dissent.